[Cite as *State v. Coleman*, 2016-Ohio-7335.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-15-1056

      Appellee                            Trial Court No. CR0201302281

v.

Joel Coleman                                 **DECISION AND JUDGMENT**

      Appellant                           Decided:  October 14, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Lorin J. Zaner, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Joel Coleman, appeals the judgment of the Lucas County Court

of Common Pleas, convicting him of one count of rape in violation of R.C.

2907.02(A)(1)(b) and (B), a felony of the first degree, and two counts of gross sexual

imposition in violation of R.C. 2907.05(A)(4) and (C), felonies of the third degree. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} Appellant was indicted by the Lucas County Grand Jury on two counts of rape and two counts of gross sexual imposition. The first count of rape—Count 1— alleged that on or around October 2005 to October 2006, appellant knowingly engaged in sexual conduct with his cousin, D.R., who at the time was under ten years of age. The second count of rape—Count 2—alleged that in August 2012, appellant knowingly engaged in sexual conduct with D.R., who at the time was under the age of 13. The two counts of gross sexual imposition—Counts 3 and 4—alleged that between October 2005 and August 2012, appellant knowingly had sexual contact with D.R.[1] Appellant entered pleas of not guilty, and the matter proceeded to a jury trial.

{¶ 3} At the trial, the state presented three witnesses in its case in chief. The first witness was D.R. She testified that when she was five or six years old—which corresponds with the October 2005 to October 2006 time frame—she was in a room with appellant at her great grandmother's house on Lincoln Avenue in Toledo. She was on a bed on her hands and knees and appellant put Vaseline on his penis and "stuck his private part in [her]."

{¶ 4} She testified that on another occasion, around August 2012, when she was 11 years old, appellant told her to pull her pants down and he "licked [her] in [her]

---

[1] Notably, appellant requested a bill of particulars. In response, the state referred appellant to a police report that was provided in discovery, but which is not part of the record.

2.

private parts." She testified that it "felt weird, like it tickled." In describing the circumstances surrounding the August 2012 incident, D.R. stated that she and her brother were with appellant the entire day. At one point, they stopped and got food from McDonald's and took it to her grandparents' house on Parkside in Toledo to eat. Appellant molested her in the basement of her grandparents' house. He then took D.R. and her brother home, and gave $40 to her and $20 to her brother.

{¶ 5} D.R. testified that a third incident occurred sometime when she was between eight and ten years old, but she did not provide any details. She also testified that one time, in the house on Parkside, appellant showed her a pornographic movie, then he "put his private part in [her]" while she was on her hands and knees.

{¶ 6} Finally, D.R. testified to an occasion where appellant tried to put his penis in her but it would not go in, so he told her she would have to "suck it." D.R. testified that she did not, in fact, suck appellant's penis. She did not remember how old she was when this occurred.

{¶ 7} On cross-examination, D.R. clarified that appellant only touched her three times. She testified that when appellant had sex with her he did not go in all the way, and she did not like the feeling.

{¶ 8} The next witness called by the state was Julie Kenniston, who was certified as an expert in the field of child sexual abuse, particularly as it relates to suggestibility, delayed reporting, and grooming. Kenniston testified that by the age of 10 to 12, in general, children are similar to adults in terms of being susceptible to suggestibility, i.e., being convinced that something occurred when it in fact did not occur, or reporting

3.

something based on what they are being told to report. Kenniston also testified that it is not uncommon for children to wait to report incidents of sexual abuse, and that 90 percent of abused children do not disclose the abuse before age 18. Her testimony revealed that part of the reason for not reporting abuse is that the children are groomed by the abusers to think that nothing is wrong or that there will be bad consequences if they report the abuse. Kenniston testified that she did not interview D.R., but in the thousands of cases in which she was involved there was not a single child who schemed or planned the allegations as a form of retaliation. Kenniston concluded by discussing D.R.'s videotaped interview with a person from Lucas County Children Services, in which D.R. described the abuse and implicated appellant as the abuser.[2] Kenniston stated that the interview was not good in terms of how the interviewer questioned D.R., but she concluded that it was not so bad that the interview reaffirmed a prior suggestion placed in D.R.'s mind that appellant was the abuser. Kenniston reached this conclusion based on the details that D.R. gave and her resistance to being led in other parts of the interview.

{¶ 9} The state's final witness was Dr. Randall Schlievert, who testified as an expert witness in the field of child sexual abuse. Schlievert testified that on January 30, 2013, he examined D.R. and discovered physical findings of a torn hymen indicative of penetrating trauma, which he concluded was caused by a male penis. Schlievert further testified that in his interview with D.R., she identified appellant as the abuser, and he did not have any sense that D.R. was making up the allegations. On cross-examination, Schlievert testified that the trauma to the hymen was not recent, and he would not have

---

[2] The videotaped interview was not entered into evidence.

4.

expected it to have occurred in the last three months. He stated that the injury appeared to be at least a year old, if not older. On redirect, he testified to a reasonable degree of medical certainty, based on the history taken from D.R., that the injury would have occurred between the ages of 5 and 11. On further cross-examination, Schlievert was questioned regarding the discharge summary from D.R.'s visit to Toledo Children's Hospital on January 8, 2013. The discharge summary indicated that the genital urinary exam was normal and that there were no signs of trauma. Schlievert opined that "If you don't use a swab like we use you're going to miss tears of the hymen, you can't just look [at] it, so I wouldn't feel comfortable stating that this was an accurate exam unless they were more detailed in their documentation." Notably, the medical records indicate that the treating physician at Toledo Children's Hospital performed a vaginal swab. On further re-direct examination, Schlievert testified he used a colposcope to examine D.R., and he did not see any documentation that the physician at Toledo Children's Hospital used a swab or other tool to help evaluate the hymen.

{¶ 10} Following the state's witnesses, the state moved to admit Kenniston's curriculum vitae and the medical records from Toledo Children's Hospital as evidence. The court admitted those documents without objection. Thereafter, appellant moved for a Crim.R. 29 acquittal, which the trial court denied.

{¶ 11} Appellant then presented six witnesses in his defense. The first witness was his mother, O.A. O.A. testified that although they had a big family, it was a close family, and that everyone helped each other as it was needed. She testified that appellant would buy presents, clothes, shoes, or school supplies for the children, including D.R.

5.

and her brother, if the parents were unable to. O.A. further testified that the family would gather frequently for holidays and birthdays and that she had no knowledge of appellant ever being alone with D.R., or behaving inappropriately or paying special attention to D.R. On cross-examination, O.A. stated that she was aware of the examination at Toledo Children's Hospital, and that there were no signs of trauma found. O.A. was asked if she was aware of the examination by Dr. Schlievert, which did find signs of trauma on the hymen, to which O.A. replied that she was not aware.

{¶ 12} The next witness to testify was D.H., who is appellant's girlfriend and the mother of his children. Like O.A., D.H. testified that appellant's family was close and would often get together for celebrations. She also testified that appellant would buy things for D.R. and D.R.'s brother, or would give money to their mother or other people in the family as needed.

{¶ 13} Appellant then called F.M. to testify. F.M. is appellant's cousin. F.M. testified that he was at the grandparents' house in August 2012 when appellant arrived with D.R. and her brother. F.M. testified that he was on the couch and his grandfather was in a chair watching television. F.M. described that the children came in and ate food from McDonald's at the dining room table. F.M. talked to the children about what they had been doing, and they were excited to tell him about the new clothes and shoes appellant had gotten them for school. While they were eating, appellant went outside on the porch where F.M.'s mother and younger brother were. F.M. testified that after the children ate, D.R. and her brother went outside briefly and then left. F.M. stated that neither D.R. nor appellant ever went downstairs in the basement. On cross-examination,

6.

F.M. testified that there was a door to the basement located outside. However, he stated that the door was almost always locked unless there was a party or family gathering where people needed to carry things inside.

{¶ 14} The next witness was M.G. M.G. is appellant's aunt. M.G. testified that the family is very close, and it is common for the family to provide financial support to one another when there is a need. M.G. also testified that appellant's interaction with his cousins and with the rest of the family was never inappropriate.

{¶ 15} Following M.G., appellant called Dr. Jolie Brams, Ph.D., as an expert witness in forensic psychology, specifically in the area of child sexual abuse. Brams testified to her concerns with the method in which the Lucas County Children Services interview with D.R. was conducted. She stated that the research shows that children can be tainted by poor interviews. In this case, she cautioned that the interview "did not meet protocols and violated what we know about child development, about suggestibility, about many other issues that deal with the core of this case." Of particular note was Brams's concern regarding a "pre-interview" that was not recorded, so there is no way to know what was said during that pre-interview. Brams also criticized Kenniston's conclusions, stating that Kenniston minimized or did not address the failure to follow protocols in the interview which led to confirmatory bias. On cross-examination, Brams clarified that she does not know whether D.R. was sexually abused or not, but that her testimony is that the forensic interview conducted by the Lucas County Children Services employee was "one of the worst forensic interviews I ever had the chance to review out

7.

of hundreds of cases and that the violations of protocol and of just judgment and reason really were glaring."

{¶ 16} The final witness to testify was appellant. Appellant detailed that on the August 2012 day in question he took the kids to buy shoes, and then they went to McDonald's. They took the food from McDonald's to his grandparents' house, where they stayed for 30 minutes to one hour while the children ate. During that time, appellant went outside to smoke. Afterwards, they left and appellant took the children home. Appellant testified that on that day he did not go in the basement with D.R., was not alone with D.R., and did not touch D.R. sexually. Furthermore, appellant testified that he has never had sexual relations with D.R., has never forced sexual relations on D.R., and has never asked D.R. to touch him sexually. Appellant testified that he believed that D.R. accused him of sexual abuse because he had a falling out with D.R.'s mother. Appellant also noted that he voluntarily met and cooperated with the police, and provided a DNA sample.

{¶ 17} Following the testimony, appellant renewed his Crim.R. 29 motion, which the trial court denied. After the closing arguments, the jury was instructed and then retired to deliberate. The jury returned with a verdict finding appellant not guilty of rape during the period of October 2005 to October 2006 under Count 1, but guilty of rape during the period of August 2012 under Count 2. The jury also found appellant guilty of both counts of gross sexual imposition under Counts 3 and 4.

{¶ 18} The matter was continued for a sentencing hearing and preparation of a presentence investigation report. At sentencing, the trial court, without objection from

8.

the state, merged Counts 2, 3, and 4, and sentenced appellant on Count 2. Thereafter, the trial court imposed a sentence of ten years to life in prison.

## II. Assignments of Error

{¶ 19} Appellant has timely appealed his judgment of conviction, asserting seven assignments of error for our review:

1. The Appellant was denied due process and a fair trial pursuant to U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1 §10 when the trial court did not order an acquittal of the charges as the evidence was legally insufficient to sustain a conviction.

2. The Appellant was denied due process and a fair trial pursuant to U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1 §10 as all of his convictions are against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented.

3. The trial court erred by permitting testimony from both State experts that constituted improper vouching for the alleged victim in violation of Evidence Rule 702, U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1 §10.

4. The trial court erred when it allowed a "manufactured witness", the state's medical expert, to testify about the alleged victim's out-of-court hearsay statements in violation of Evid.R. 803(4).

5. The Appellant was denied due process and a fair trial pursuant to U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1 §10 when the

Prosecutor engaged in misconduct throughout the trial and in the closing statements at trial, which conduct substantially prejudiced the Appellant and misled the jury.

6. The Appellant was denied his Constitutional right to effective assistance of counsel when the Appellant's trial counsel failed to protect Appellant's rights at trial.

7. The Appellant was denied due process and a fair trial pursuant to U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1 §10 as the errors committed by the Trial Court and the Prosecutor combined to deny the Appellant a fair trial.

### III. Analysis

{¶ 20} For ease of discussion, we will address appellant's assignments of error out of order, beginning with his fourth assignment of error.

### A. Admissibility of Schlievert's Testimony under Evid.R. 803(4)

{¶ 21} In his fourth assignment of error, appellant argues that Schlievert was a "manufactured witness," and the trial court erred in allowing him to testify regarding D.R.'s statements during his interview with her. Because appellant did not object to Schlievert's testimony, we review this assignment for plain error. *State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992). Plain error consists of a deviation from a legal rule, which is an obvious defect in the trial proceedings, and which affected the outcome of the trial. Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost

10.

caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 22} During his testimony, Schlievert recounted D.R.'s statements that she had been molested by appellant starting when she was five or six years old, and ending when she was 11 years old; that the abuse consisted of penile intercourse with appellant sometimes using Vaseline and sometimes not; that she was bribed with presents, snacks, and money; that she saw clear liquid come out of appellant's "private area" on one occasion; that the abuse occurred at her grandparents' house; and that one time appellant "licked her."

{¶ 23} Appellant contends that the statements made to Schlievert were not reasonably necessary for purposes of medical diagnosis and treatment, and thus not within the hearsay exception under Evid.R. 803(4), which excludes from hearsay "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Schlievert testified that the information was pertinent because it helped determine the need to test for sexually transmitted diseases, the manner in which the child should be protected so that the abuse does not happen again, and the impact on the victim's psychological health. Appellant argues, however, that those reasons are not meaningful in this case because Toledo Children's Hospital had already tested for sexually transmitted diseases and D.R. had already identified appellant as the abuser both

11.

at the hospital and to a person from Lucas County Children Services. Thus, the reasons supporting the need for the information had already been satisfied.

{¶ 24} Appellant analogizes the present situation to that in *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13 (11th Dist.). In *Butcher*, Dr. Dewer testified regarding the victims' statements that gave the narrative background of the abuse and identified the abuser. Dewer testified that the identity of an alleged abuser is necessary to determine issues pertaining to the safety of the child and the risk of sexually transmitted diseases. However, the Eleventh District rejected Dewer's rationale, noting that the victims were not tested for sexually transmitted diseases. Furthermore, the court found persuasive the manner in which the children came to be examined by Dewer. The court found that the children had already been seen by a private doctor, and it was the county children services board, not that doctor, that referred the children to Dewer. The social worker from children services also was present at the hospital when the children were examined by Dewer. In addition, the investigating detective testified that he did not interview the children, but referred them to Dewer for the purposes of an interview and examination. The court recognized that the children "were taken to see Dr. Dewer upon the recommendation of state agents, namely children services and the police. It is readily apparent that Dr. Dewer's primary function was to collect evidence to support a conviction." *Id.* at ¶ 66. Thus, the court concluded, "[A] doctor is not permitted, during a medical examination, to assume the role of a police investigator, elicit statements from the alleged victims, and, then, testify regarding those statements under the guise that they were given for the purpose of medical diagnosis or treatment." *Id.* at ¶ 68.

12.

{¶ 25} We find that the present case is distinguishable. There is nothing in the record that indicates how D.R. came to see Schlievert, other than Schlievert mentioning a possible referral.[3] While it is true that D.R. had already given her history to the hospital doctor and had been tested for sexually transmitted diseases, those facts alone do not transform Schlievert's examination into something other than for purposes of medical diagnosis and treatment, particularly where D.R was initially examined by the hospital doctor and Schlievert is a specialist in child sexual abuse. Furthermore, unlike *Butcher*, Schlievert testified that the examination was done for medical purposes, and was independent of any investigation.[4] Therefore, we hold that it was not plain error for the trial court to allow Schlievert to testify as to D.R.'s hearsay statements pursuant to Evid.R. 803(4), as the record shows that the statements were made for the purposes of medical diagnosis or treatment.

{¶ 26} Accordingly, appellant's fourth assignment of error is not well-taken.

**B. Admissibility of Kenniston's and Schlievert's Testimony under *Boston***

{¶ 27} In his third assignment of error, appellant argues that the trial court committed plain error in allowing Schlievert and Kenniston to provide improper

---

[3] "It doesn't mean I necessarily received records but that we were aware of what happened at her visit [at Toledo Children's Hospital]. It does not mean I had the records but that would be like perhaps the mother or case worker telling us that the child had been to ER previously for an emergency exam and then referred to us."

[4] While discussing who was present during his interview of D.R., Schlievert stated: "No family no other persons certainly not law enforcement or case workers. This is medical so like any other doctor's office we don't have police or other people in there they do their own stuff."

13.

vouching testimony in violation of Evid.R. 702.[5] In *State v. Boston¸* 46 Ohio St.3d 108, 126, 545 N.E.2d 1220 (1989), the Ohio Supreme Court held that "the use of expert testimony [in child sexual abuse cases] is perfectly proper and such experts are not limited just to persons with scientific or technical knowledge but also include other persons with 'specialized knowledge' gained through experience, training or education." "[A]n expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible pursuant to Evid.R. 702 and 704." *Id.* at 128. However, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Id.* at syllabus.

{¶ 28} Subsequently, the Ohio Supreme Court affirmed its position in *State v. Stowers*, 81 Ohio St.3d 260, 262-263, 690 N.E.2d 881 (1998), noting that *Boston*

> excludes expert testimony offering an opinion as to the truth of a child's
> statements (*e.g.*, the child does or does not appear to be fantasizing or to
> have been programmed, or is or is not truthful in accusing a particular

---

[5] Evid.R. 702 provides,

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

14.

person). It does not proscribe testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the finder in assessing the child's veracity. (Emphasis sic.)

{¶ 29} Therefore, an expert in child sexual abuse can testify as to his or her opinion on whether the child was abused, but the expert may not testify as to the veracity of the child's statements. A difficulty arises, however, where the expert bases his or her opinion that a child was sexually abused solely on the child's statements. In those cases, the expert's "'diagnosis' is nothing more than an opinion on the child's veracity." *State v. Schewirey*, 7th Dist. Mahoning No. 05 MA 155, 2006-Ohio-7054, ¶ 50. Thus, for the expert's opinion to be admissible, "'there simply has to be something other than the child's unsupported allegations that assisted the expert in arriving at his or her opinion. This would obviously include physical evidence, but could also involve the expert's observations of the child's demeanor or other indicators tending to show the presence of sexual abuse.'" *Id.* at ¶ 48, quoting with approval *State v. Plymale*, 11th Dist. Portage No. 99-P-0012, 2001 Ohio App. LEXIS 4981 (Nov. 2, 2001) (Christley, J., dissenting).

{¶ 30} Turning to the testimony in this case, we hold that Kenniston's testimony was within the parameters of *Boston* and *Stowers*. As identified by appellant, Kenniston testified generally regarding statistics pertaining to suggestibility, delayed disclosure, and coaching. Kenniston elaborated that the possibility that a child has been coached to make certain statements can be evaluated by examining the level of detail with which the child can explain what happened, what the child's feelings were, and what else was happening at the time. All of this testimony is permissible under *Boston* and *Stowers* as it does not

15.

directly speak to D.R.'s credibility but rather "is additional support for the truth of the *facts testified to* by the child, or which assists the finder in assessing the child's veracity." *Stowers* at 263.

{¶ 31} Appellant cites *State v. Coffman*, 130 Ohio App.3d 467, 720 N.E.2d 545 (3d Dist.1998), and *State v. Whitt*, 68 Ohio App.3d 752, 589 N.E.2d 492 (8th Dist.1991), for the proposition that the use of percentages and experiences from previous cases to bolster the child's testimony is improper. However, we find those cases to be distinguishable on the facts. In *Coffman* and *Whitt*, the offending testimony was that a stated percentage of cases involved false accusations. *See Coffman* at 472 ("I don't remember [a case] where a child was ever lying."); *Whitt* at 758 (three of 80 to 100 cases involved false accusations). Here, in contrast, Kenniston did not testify to the percentage of children that were truthful, nor did she express an opinion on D.R.'s truthfulness. The closest Kenniston came to such testimony were two statements wherein she stated (1) that of the 3,000 children she has seen, none have been able to scheme or plan the allegations as a form of retaliation, and (2) that to a reasonable degree of scientific certainty she did not believe that the Lucas County Children's Services interviewer suggested to D.R. that she was sexually abused. While they are nuanced distinctions, Kenniston's testimony was not that D.R.'s statements were truthful, but instead were limited to the question of whether D.R. planned the allegations as retaliation in the case of the former, and the conclusion that it was not the interviewer who planted the suggestion in the case of the latter. Therefore, because Kenniston's testimony did not impermissibly bolster D.R.'s credibility, we hold that it was properly admitted.

16.

**{¶ 32}** Similarly, we find that it was not plain error to admit Schlievert's testimony. Appellant first takes issue with Schlievert's conclusion that the injury he found to D.R.'s hymen was caused by a male penis, and that he reached that conclusion based on the history given by D.R. of years of multiple penile rapes. This testimony is permissible under *Boston* and *Stowers* as it does not directly offer an opinion on D.R.'s veracity, and is grounded in the physical evidence as well as his experience that this type of injury is not self-inflicted.

**{¶ 33}** Appellant next challenges Schlievert's testimony that the "medical evaluation" revealed that appellant was the perpetrator. Likewise, appellant challenges Schlievert's testimony that he "didn't have any sense that [D.R. was making up any allegations against appellant]." We find that in both instances, Schlievert's testimony was improper. The first statement reaches a medical conclusion based only on D.R.'s statements. There was no other evidence, physical or otherwise, that implicates appellant as the abuser other than D.R.'s statements. Thus, Schlievert's conclusion "is nothing more than an opinion on [D.R.'s] veracity." *Schewirey*, 7th Dist. Mahoning No. 05 MA 155, 2006-Ohio-7054 at ¶ 50. The second statement is even more direct, and can only be interpreted as Schlievert commenting on whether D.R. was being truthful. Such testimony is in direct violation of *Boston*.

**{¶ 34}** Nevertheless, although we find that it was error to admit those portions of Schlievert's testimony, we do not hold that it was plain error. "Recent case law states that '*Boston* does not apply when the child victim actually testifies and is subject to cross-examination.'" *State v. Hupp*, 3d Dist. Allen No. 1-08-21, 2009-Ohio-1912, ¶ 20,

17.

quoting *State v. Thompson*, 4th Dist. Washington No. 06CA28, 2007-Ohio-5419, ¶ 50. *See also State v. Smith*, 7th Dist. Mahoning No. 14 MA 0159, 2016-Ohio-3418, ¶ 45; *State v. Benjamin*, 8th Dist. Cuyahoga No. 87364, 2006-Ohio-5330, ¶ 19; *State v. Smith*, 12th Dist. Butler No. CA2004-02-039, 2005-Ohio-63, ¶ 24. "Although having a witness testify that the victim is telling the truth is an error, it is harmless error if the victim testifies and is subject to cross-examination." *Hupp* at ¶ 20, citing *Thompson* at ¶ 51. Therefore, because D.R. testified and was subject to cross-examination, we hold that any error in admitting Schlievert's testimony was harmless.

{¶ 35} Accordingly, appellant's third assignment of error is not well-taken.

### C. Prosecutorial Misconduct

{¶ 36} In his fifth assignment of error, appellant argues that there were 33 instances of statements or questions that comprised prosecutorial misconduct: six during the trial, and 27 during closing arguments. "The test for prosecutorial misconduct is whether remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Id.* at 166, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where there are improper remarks, "it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty." *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984).

18.

{¶ 37} We will begin with the six incidents during the trial. Four of the incidents complained of by appellant involved the prosecutor cross-examining defense witnesses and appellant regarding whether they were aware of Schlievert's finding of trauma to D.R.'s hymen. We agree with the state's argument that this line of questioning was proper. One of the purposes of the defense witnesses' testimony was to attest to the character of appellant to suggest that he did not engage in improper conduct with D.R. The state, on cross-examination, was pursuing whether, in holding that view of appellant, the witnesses were aware of Schlievert's finding of sexual abuse. *See* Evid.R. 405(A) ("In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.").

{¶ 38} The fifth incident pertained to the prosecutor's cross-examination of Brams, during which the prosecutor quoted lines from Schlievert's report—which the prosecutor acknowledged was inadmissible hearsay—and twice mischaracterized Brams' testimony to suggest that she stated that D.R. made up the allegations based on the poor interview by the Lucas County Children Services employee. While we find the conduct of the prosecutor in these instances discouraging, particularly his persistent mischaracterization of Brams' testimony, we do not find that appellant was prejudiced as Brams eloquently, forcefully, and repeatedly corrected the prosecutor and reemphasized

that her testimony was limited to a determination that D.R.'s interview with the Lucas County Children Services employee should be questioned because of how poorly it was conducted.

{¶ 39} The sixth incident involved the prosecutor's failure to recognize that the Toledo Children's Hospital records evidenced that the doctor there performed a vaginal swab on D.R., and the prosecutor's elicitation of testimony from Schlievert that Schlievert's exam was more thorough because he used a swab to identify the injury to D.R.'s hymen, and the other doctor did not. This incident is a pervasive theme in appellant's brief that is also raised in his third, fourth, and sixth assignments of errors. For the moment we will reserve our discussion of appellant's arguments on this issue, and turn to his allegations of prosecutorial misconduct in the closing argument.[6]

{¶ 40} "The prosecution is normally entitled to a certain degree of latitude in its concluding remarks." *Smith*, 14 Ohio St.3d at 13, 470 N.E.2d 883. However, the prosecution must "avoid insinuations and assertions which are calculated to mislead the jury;" must not "express his personal belief of opinion as to the credibility of a witness or as to the guilt of the accused;" is not to "allude to matters which will not be supported by admissible evidence;" and should not "make unfair or derogatory personal reference to opposing counsel." *Id.* at 14.

{¶ 41} Of the 27 statements that appellant finds objectionable, nine pertain to comments about D.R. In context, those statements are:

---

[6] There were two prosecutors assigned to this case at trial. One of the prosecutors gave the initial closing remarks, and the other gave the final closing remarks.

20.

I'll be honest, this is my first jury trial, so I'm extremely nervous and I've been nervous all week. So I think about that and how I felt all week, and then I think about [D.R.] and I can't even imagine what that child has went through over the years but even just to walk in here and to testify in front of you and then the topic that she had to discuss, to discuss sexual activity. I don't know about you, but that makes me very uncomfortable to talk to strangers about, so for a now 14-year-old child to have to discuss that, I can't imagine the courage that it took for her.

As it was testified to, [D.R.], she originally disclosed January 2013. It's January 2015 now. So for two years she's been waiting. She has been trying to push this out of her mind, trying to get on with her life, and then she's called to come testify regarding something that happened when she was 5 or 6 up until through about the age of 12.

How would you do if you were called upon to do that? How would you do if I said tell me about your first sexual experience? Even how would you do if I said what happened to you August, when you were 11 years old, or when you were 5, how much detail could you give me about a particular day and time?

* * *

* * * When you receive the jury instructions on judging credibility, you are the sole judges of credibility of these witnesses. To judge credibility you can look at the appearance of the witness; the manner of

testifying; reasonableness of the testimony; the opportunity he or she had to see the act and know the things concerning which the witness was testifying to; accuracy of memory; frankness and lack of it; intelligence; interest and bias, if any.

And I just want to comment on accuracy of memory. We're talking about a 14-year-old child now. She first disclosed when she was 12. For two years she's had to change schools, get new friends, barely has any contact with this close family that she grew up with. She's tried to push this out of her mind for two years. So judge her memory based off of what a 14-year-old child now would be.

Interest and bias. Ladies and gentleman, use your common sense. Think about [D.R.] on that witness stand. Did that child have anything to gain by testifying that this man sexually abused her? Look at everything she had to go through up until this point. First she was molested by this guy, a family member, someone who she thought she could trust. She has to tell her family, she has to tell Dr. Schlievert, she has to tell Children Services, a detective. She has to come talk to the prosecutors, the grand jury, and then ultimately she has to come testify here. So for two years she's had to go through this. If it didn't really happen do you believe that she would still be following through with this, that she would still be hurting because her family's struggling without the help of her family?

She was on public display when she came here, but she did it. She came, she told the truth. She described things that she saw with her own eyes, heard with her own ears and felt with her own body. The courage that must have took to talk about something that most adults don't even feel comfortable discussing. She did her best to recall incidents that occurred over two years ago and beyond.

Use all the tests of credibility and you will find that [D.R.] alone is proof enough beyond a reasonable doubt.

{¶ 42} Appellant contends that the prosecutor's statements were an improper sympathy ploy, that they contained facts not in evidence as there was no testimony that the victim was trying to "push this out of her mind for two years," that the statements denigrated his right to confront his accuser, and that the prosecutor improperly vouched for the accuser. We disagree.

{¶ 43} Read in context, the prosecutor was simply making the argument that when the jurors applied the tests of credibility and their own common sense, they would come to the conclusion that D.R. was being truthful. As such, these statements are well within the prosecutor's purview. We do note, however, that the prosecutor should not have commented on D.R.'s veracity, stating that "she told the truth." Nevertheless, given the prosecutor's own exhortation that the jurors are the sole judges of credibility, and the consistency of this theme throughout her closing, we do not find that this one slip deprived appellant of a fair trial.

23.

{¶ 44} Appellant next contends that the prosecutor misconstrued the evidence on several occasions. First, he cites to the prosecutor's statements that "Of course that's the child [appellant] chooses to rape repeatedly," and "Two counts of sexual conduct are proven through several acts of intercourse, several acts of -- excuse me, several acts of intercourse." Appellant asserts that the use of the terms "repeatedly" and "several" are an improper insinuation as D.R's testimony indicated only three acts total, only two of which involved intercourse. Given the multiple allegations in this case, we find no prejudice in the prosecutor using the terms "repeatedly" and "several" instead of "on two occasions" and "a couple."

{¶ 45} Next, appellant cites the prosecutor's statements that "The State would submit that when someone touches a little girl's vagina and puts his penis in a little girl's vagina and anus and licks her vagina, that there is knowledge that it will cause a certain result," and "[The basement] is where [D.R.] testified that he licked her vagina. [D.R.] testified that it tickled." Appellant contends that these statements refer to facts not in evidence as D.R. never used the word "vagina," never testified where appellant "put it in," and testified that there was no anal sex. While it is true that D.R. did not use the term "vagina," she did testify that appellant "told me to pull my pants down and he licked me in my private parts." The fact that she referenced pulling down her pants leads to the reasonable inference that when she used the term "private parts," she was referring to her vagina. Also, D.R. testified on cross-examination that she did not have anal sex with appellant, but further stated on re-direct that she did not know where he put his penis,

24.

explaining that "I know he put it in but I don't know exactly where because I was like young and didn't know." Therefore, we do not find the prosecutor's statements to be a mischaracterization of the evidence.

{¶ 46} He also cites the prosecutor's statements regarding sexual contact: "Two counts of sexual contact are proven through [D.R.] testifying that the defendant touched her vagina and her butt with his penis, and had her touch his penis," and "Joel Coleman touched her vagina when he was attempting to put his penis in her yet could not get it in. So he did not penetrate her on that occasion, but there was sexual contact." Appellant argues that those facts are not in evidence, and that the gross sexual imposition charges pertain only to the August 2012 incident. We agree that D.R.'s testimony does not include a statement that she touched his penis. However, the remaining facts are in evidence, and given the overlap between sexual conduct and sexual contact, we do not find any prejudice in the prosecutor's statements. Regarding the limitation of the gross sexual imposition charges to August 2012, appellant is basing this argument on the fact that the court merged the counts for purposes of sentencing with the prosecutor's consent. However, the indictment details the timeframe for the gross sexual imposition charges as between October 2005 and August 2012, and the jury was similarly instructed. Thus, it was not incorrect to refer to those events when discussing sexual contact at closing.

{¶ 47} Fourth, appellant contests the prosecutor's statement that "Dr. Schlievert testified that [D.R.] was found to have scarring that may have been caused by the assault." Appellant takes issue with the word "scarring," as that was never used by Schlievert. Indeed, Schlievert testified that [D.R.] "had physical findings of torn hymen

25.

indicative of penetrating trauma." We find that appellant's argument is merely an exercise in semantics, and the prosecutor did not mischaracterize Schlievert's testimony.

{¶ 48} Next, appellant cites the prosecutor's statements regarding Brams' testimony:

Dr. Brams herself admitted over and over and over again, straight down the line of the report that Dr. Schlievert put together, that she would have asked the same questions that were asked by Dr. Schlievert's assistant Kim Jones. Common sense would tell us that if Dr. Brams had been present at the time that she was asking those questions and received that information, would she have ignored the answers that were obtained? Not likely.

But Dr. Brams -- that made Dr. Brams nervous, and she repeatedly wanted to say that she really wasn't here for those purposes. She was here to comment on [the Lucas County Children Services worker] and the CSB interview which was bad. Well, the State of Ohio never disputed that it was bad. Our own expert Julie Kenniston told you that it was bad. It was bad because protocols weren't followed, protocols that Dr. Brams recognizes and agrees were written with the help of, gee, Julie Kenniston. Imagine that. And those are the same protocols she follows, she being Dr. Brams.

But she was there for the sole purpose of criticizing that CSB interview, twenty-eight minutes, as she indicated, of that interview. Twenty-eight minutes of an episode in this child's life, you heard Dr.

Brams, are enough to disparage and trash the memory and events that occurred over the period of seven years that this child has had to live with because someone didn't ask the questions in the right way. It's nonsense.

{¶ 49} Appellant first argues that Brams never admitted repeatedly that she would have asked the same questions as Schlievert. During her testimony, Brams agreed that she would have asked similar questions, but qualified that she would not have necessarily asked them in the same manner or at the same time. While the prosecutor's statements in closing are an exaggeration of the testimony, we do not find that it rises to the level of mischaracterization. Second, appellant argues that Brams never testified that she followed a protocol written by Kenniston. Contrary to appellant's assertion, on cross-examination, Brams testified that she was aware that Kenniston helped develop the protocols and knew that Kenniston has been involved in teaching people how to use the protocols. Thus, we do not find this statement to be a mischaracterization of the evidence. Finally, appellant contends that Brams did not testify that the poor interview was enough to "disparage and trash" D.R.'s memory. We agree, and we can find no support in the record for the prosecutor's statement, which appears to be a continuation of his mischaracterization of Brams' testimony that began during his cross-examination. Nevertheless, we do not find that this comment was sufficient to render the trial unfair.

{¶ 50} Finally, appellant cites two statements from the prosecutor contained in the following paragraph regarding the timing of D.R.'s interview with Schlievert:

The reason [Brams' testimony] is nonsense is because before [the Lucas County Children Services worker] interviewed this child, before

27.

[D.R.] even knew who [the Lucas County Children Services worker] was, stepped through the door at CSB, she was interviewed by Toledo ER. We didn't ask those questions. The child divulged it to the ER doctor. Before she met [the Lucas County Children's Services worker] or talked to anyone at CSB she met Dr. Schlievert who conducted that interview through Kim Jones. And the questions that were asked and answers provided, per Dr. Brams herself, were proper.

Appellant contends that the prosecutor's statements misstate the evidence because D.R.'s interview with Schlievert occurred *after* the Lucas County Children Services interview, not *before* it. Evidently, the prosecutor was confusing Schlievert's interview with the examination conducted at Toledo Children's Hospital, which occurred before D.R. met with Children Services. While the statement was technically incorrect, we do not find that it resulted in any prejudice because the prosecutor's point was that the bad interview conducted by Lucas County Children Services could not have had any impact on D.R.'s prior disclosure. That premise remains true because although D.R. had not met with Schlievert at that point, she had already disclosed the abuse and identified appellant as the abuser during her examination at Toledo Children's Hospital prior to her interview with Children Services. Thus, we find the prosecutor's misstatements harmless.

{¶ 51} Turning now to other instances of alleged misconduct in closing argument, appellant argues that the prosecutor improperly told the jury that they did not have to consider an element of the crime when she stated—after discussing Schlievert's testimony that his exam revealed that D.R. was sexually abused between the ages of five

28.

and 12—"So the question is not whether or not -- the question is not whether [D.R] was sexually abused but who sexually abused [D.R.]. And who to better answer that than her, the child herself, the only one, the only witness that was there to see what happened to her body, to feel what happened to her body and who caused this trauma." We find nothing wrong with the prosecutor's statement, because although it conveyed the state's position that the question of whether D.R. was sexually abused was unassailable, the prosecution is free to comment on what it believes the evidence demonstrated.

{¶ 52} Appellant next decries the prosecutor's statement that "There's no contention against Dr. Schlievert's finding of physical injury. The Toledo ER report didn't come after that, after his exam, and say no, we didn't find anything. It was before. There's no defense evidence that says that we have a doctor that takes issue with that. It's uncontroverted." Appellant argues that the prosecutor's statement improperly attempted to shift the burden of proof to the defense. We disagree, and find that the statement was well within appropriate closing argument about what the evidence showed.

{¶ 53} Appellant also challenges the prosecutor's statements which invoked Jerry Sandusky:[7]

> Grooming involved the defendant's placement in and careful consideration of and manipulation of the environment that he existed in.
>
> That's not to suggest that the things he did for family were all put on, they were all a ruse so that he could have access to the child. But

---

[7] Jerry Sandusky is a former Penn State University assistant football coach who was convicted of multiple counts of child sexual abuse.

29.

remember the example of Jerry Sandusky. Jerry Sandusky formed these youth groups and worked with children because he wanted to. These were good things. They were noble causes. Helped a lot of kids. But at the same time, being around them on a regular continuous basis provided opportunity, and that's what we have here. Someone who did great things, good things, noble things for his family but it provides him opportunity.

{¶ 54} Appellant contends that the statement improperly compared him to a convicted rapist to invoke negative emotion. Here, the reference to Jerry Sandusky related back to Kenniston's testimony where, in responding to a question regarding grooming, she invoked him as an example. In that context, we do not find that the prosecutor's comments were calculated to mislead the jury into making a finding based on anything other than the evidence presented. Thus, we find no misconduct arising from this statement.

{¶ 55} Finally, we will now address appellant's arguments concerning the prosecutor's comments pertaining to Schlievert's testimony that his exam was more thorough because he used a swab to identify the injury to D.R.'s hymen, and the other doctor did not. Appellant identifies four instances of prosecutorial misconduct in relation to this testimony; one in soliciting the testimony, and three during closing argument. Appellant also raises this issue in his third and fourth assignments of error, as well as his sixth assignment of error for ineffective assistance of counsel. The nature of appellant's arguments is that although Schlievert testified that his exam was more thorough because

he used a swab (and a colposcope), his testimony was inaccurate because the Toledo Children's Hospital records revealed that the doctor there also performed a vaginal swab.

{¶ 56} Regardless of appellant's theory of error, however, the result must be that the error, if any, is harmless beyond a reasonable doubt. The only impact of Schlievert's testimony on this point was to show that D.R. suffered physical injury caused by a male penis. In this case, the only count which alleged penile rape was the first count for which appellant was found not guilty. None of the three remaining counts involved conduct that would have caused injury to D.R.'s hymen; the second count of rape was limited to cunnilingus as testified to by D.R., and likewise, the counts of gross sexual imposition would not be based on insertion of the male penis. Therefore, any testimony that D.R. suffered a torn hymen was not material to the jury's finding of guilt on the remaining counts.

{¶ 57} In sum, upon our consideration of the challenged actions of the prosecutor, we hold that the prosecutor's conduct, either individually or in the collective, did not deprive appellant of a fair trial, and therefore did not constitute prosecutorial misconduct.

{¶ 58} Accordingly, appellant's fifth assignment of error is not well-taken.

### D. Ineffective Assistance of Counsel

{¶ 59} In his sixth assignment of error, appellant contends that he received ineffective assistance of counsel. To prevail on a claim of ineffective assistance, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a

31.

reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different.  *Id.* at 687-688, 694.

{¶ 60} Here, appellant argues that trial counsel was ineffective for failing to object to the issues and testimony raised in his third, fourth, and fifth assignments of error. Because we have found those assignments of error to be without merit, appellant has not satisfied the second prong of *Strickland*.

{¶ 61} Accordingly, appellant's sixth assignment of error is not well-taken.

### E. Insufficient Evidence

{¶ 62} In his first assignment of error, appellant argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal.  The standard of review for a decision regarding a Crim.R. 29 motion for acquittal is the same as that for a decision on a sufficiency challenge.  *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 63} Appellant first contends that his conviction for rape stemming from the August 2012 incident was based on insufficient evidence because D.R. testified that appellant did not have sex with her that day.  Rape under R.C. 2907.02(A)(1)(b) consists of sexual conduct with another, when the other person is less than thirteen years of age. Sexual conduct means, in pertinent part, "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex."  R.C.

32.

2907.01(A). Here, D.R. testified that appellant performed the act of cunnilingus. "Penetration is not required to commit cunnilingus. Rather, the act of cunnilingus is completed by the placing of one's mouth on the female's genitals." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 86. Thus, appellant's contention that the rape conviction should not stand because he did not have sex with her is without merit.

{¶ 64} Next, appellant argues that although D.R. testified that appellant licked her "private part," she did not define what "private part" meant. Appellant suggests that D.R. could have been referring to a non-genital part such as her chest or stomach. We disagree, and find that the jury reasonably inferred that D.R. was referring to her genitals. Earlier in her testimony, when describing the alleged penile rape in October 2005, D.R. referred to appellant's "private part." When asked to clarify, she stated that his private part was his penis, suggesting that she understood "private part" to mean genitals. Moreover, when describing the August 2012 incident, D.R. testified that appellant "told me to pull my pants down and he licked me in my private parts." As discussed in appellant's fifth assignment of error, the inclusion of the direction to pull her pants down provides context for the term "private parts," and leads to the conclusion that D.R. was referring to her genitals. Therefore, based on D.R.'s testimony, we hold that appellant's conviction for rape is not based on insufficient evidence.

{¶ 65} Regarding the two gross sexual imposition charges, R.C. 2907.05(A)(4), prohibits sexual contact with another, when the other person is less than 13 years of age. R.C. 2907.01(B) defines sexual contact as the "touching of an erogenous zone of another,

33.

including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." Appellant argues that the two charges are limited to the factual circumstances surrounding the August 2012 incident, and thus there is insufficient evidence to support them. In reaching this conclusion, appellant relies on the state's concession at sentencing that the facts supporting those counts are the same as those supporting the August 2012 rape count:

> THE COURT: With regard to allied offenses as to the facts as to Counts 3 and 4, do you believe those facts to be also the facts that were found in Count 2?
>
> [PROSECUTOR]: Yes.
>
> THE COURT: With regard to the elements?
>
> [PROSECUTOR]: Correct.
>
> THE COURT: It would be the State's position also that Counts 3 and 4 would be considered allied offenses of Count 2?
>
> [PROSECUTOR]: Correct.

{¶ 66} We are uncertain why the prosecutor agreed that the gross sexual imposition charges stemmed from the August 2012 incident, as the indictment stated that they covered the period from October 2005 through August 2012, the jury was instructed that the charges covered the October 2005 through August 2012 period, and in her closing, the prosecutor referenced allegations that were prior to August 2012 when speaking about the gross sexual imposition charges. Nevertheless, we find that any

34.

erroneous verdicts as to the counts of gross sexual imposition are harmless beyond a reasonable doubt because those counts merged with the count of rape at sentencing, and appellant only received a sentence on the count of rape. *See State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191, (1990) ("Even if we held the evidence somehow insufficient as to Count Three (charging kidnapping by restraint), it was clearly sufficient as to Count Four (charging kidnapping by removal). Since the trial court merged the kidnapping convictions with one another, Powell received only one sentence for kidnapping, and an erroneous verdict on Count Three would be harmless beyond a reasonable doubt. Thus, a finding of error on Count Three could not affect the sentence."); *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23 ("[O]ur conclusion that Worley's aggravated murder conviction was not against the manifest weight of the evidence necessarily renders any issues with the merged offenses to be harmless error because his final sentence would not be affected by any review of the evidence underlying the merged counts."). *See also State v. Croom*, 7th Dist. Mahoning No. 12 MA 54, 2013-Ohio-5682, ¶ 60; *State v. Washington*, 10th Dist. Franklin No. 09AP-424, 2009-Ohio-6665, ¶ 18.

{¶ 67} Accordingly, appellant's first assignment of error is not well-taken.

### F. Manifest Weight

{¶ 68} In his second assignment of error, appellant argues that his convictions are against the manifest weight of the evidence. When reviewing a manifest weight claim,

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines

35.

whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 69} Here, the evidence supporting appellant's convictions included D.R.'s testimony, the Toledo Children's Hospital report, and the testimony of Kenniston and Schlievert discussing, inter alia, that the veracity of child sexual abuse allegations can be tested by the amount of detail provided by the child regarding the incident, what the victim felt, what the victim wanted to see happen to the abuser, and what the circumstances were surrounding the incident. On the other hand, of appellant's defense witnesses besides himself, only F.M. was present at the grandparent's home during the incident, and he testified that he remained inside while the children and appellant went outside, where there was a door that led to the basement. Thus, he was not in a position to observe the children the entire time, and would not have seen if they had gone down into the basement. Further, Brams' testimony that D.R.'s statements during the interview with Lucas County Children's Services should be scrutinized because of the poor nature of the interview does not call into question D.R.'s initial disclosure to Toledo Children's Hospital. Finally, appellant, testifying in his own defense, denied that there was any inappropriate conduct.

36.

{¶ 70} Upon our careful review of the record, we hold that this is not the exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice, as there is ample evidence to support the jury's findings of guilt.

{¶ 71} Accordingly, appellant's second assignment of error is not well-taken.

### G. Cumulative Error

{¶ 72} In his seventh assignment of error, appellant argues that the cumulative effect of the errors during the trial deprived him of his right to due process and a fair trial. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 252.

{¶ 73} We hold that the doctrine of cumulative error is not applicable in the present case. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *State v. Jones*, 90 Ohio St.3d 403, 422, 739 N.E.2d 300 (2000), quoting *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "It is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless including most constitutional violations." *Id.* We have reviewed the record as a whole, and conclude that while it was not a perfect trial, appellant did receive a fair trial.

{¶ 74} Accordingly, appellant's seventh assignment of error is not well-taken.

37.

## IV.  Conclusion

**{¶ 75}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

                                                                          Judgment affirmed.

        A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                    _____
                                                               JUDGE
Arlene Singer, J.

                                                    _____
Thomas J. Osowik, JJ.                              JUDGE
CONCUR.

                                                    _____
                                                               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.