**[Cite as *State v. McDaniel*, 2025-Ohio-265.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                            Court of Appeals No.  L-23-1151

    Appellee                                      Trial Court No.  CR0202102931

v.

Paul McDaniel                                        **DECISION AND JUDGMENT**

    Appellant                                     Decided:  January 24, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Neil S. McElroy, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal by appellant, Paul McDaniel from the judgment of the

Lucas County Court of Common Pleas, rendered May 24, 2023.  For the reasons that

follow, we affirm the trial court's judgment.

**{¶ 2}** McDaniel sets forth one assignment of error:

Mr. McDaniel was denied effective assistance of counsel when trial counsel failed to object to improper opinion testimony by the State's expert witness, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Article One, Section Ten of the Ohio Constitution.

**Background**

**{¶ 3}** McDaniel is the father of three sons and a daughter, J.R., who is the youngest of the children. J.R. was born in 2007. J.R.'s mother is H.R. J.R. lived with her mother until she was about five years old when, due to her mother's drug issues, J.R. went to live with McDaniel, his former wife, S. (J.R.'s stepmother), and three half-brothers.

**{¶ 4}** On the afternoon of November 22, 2021, J.R. and her stepmother went to the home of the stepmother's sister ("aunt") for a girls' night and sleep-over. Early on November 23, 2021, J.R. snuck out of aunt's house and walked around for hours before she saw aunt's children's father ("uncle"). J.R. and uncle went into a nearby gas station; J.R. told the clerk to call 911. The clerk took J.R. to a back office. McDaniel arrived at the gas station, wanting to take J.R. home. The police then arrived and spoke with J.R. in the office. J.R. told the officer that she ran away because her father was raping her, and she could not take it anymore. McDaniel left the gas station, and J.R. went with the police.

**{¶ 5}** J.R. was interviewed by police and a worker from Lucas County Children Services ("LCCS" or the agency) and underwent a medical examination by a doctor and

2.

his assistant, to whom J.R. gave a history of what happened with McDaniel. J.R. was placed in a foster home.

{¶ 6} On December 2, 2021, a Lucas County Grand Jury indicted McDaniel on six counts of rape. In addition, Counts One and Two alleged the victim was under the age of ten years old at the time of the offenses.

{¶ 7} On May 9, 2023, a jury trial commenced at which 15 witnesses testified. On May 12, 2023, the jury found McDaniel guilty of all counts in the indictment. On May 23, 2023, McDaniel was sentenced to, inter alia, a prison term of life without the possibility of parole. McDaniel appealed.

## Trial

{¶ 8} A summary of the relevant testimony presented at trial follows.

**Lieutenant Philip Cook**

{¶ 9} Ltn. Cook testified he worked for the Toledo Police Department ("TPD") and provided 911 recordings upon request from the Lucas County Prosecutor's Office. He was asked to furnish 911 call records regarding an incident on November 23, 2021. Cook discovered three recorded 911 calls and other 911 calls which were not recorded due to inoperative equipment. He also located an incident detail report made by a 911 operator or dispatcher of an unrecorded call which indicated the caller "[N], her step-grandmother, . . . would like to give information about Paul inappropriately touched [sic] her."

3.

**Jacki Kessler**

{¶ 10} Ms. Kessler testified she was working at the Circle K gas station on November 23, 2021, when a young girl (J.R.) came in with uncle, at around 12:30-1:00 a.m. Uncle had just found J.R., who had run away. J.R. asked Kessler to call the police, which Kessler did. J.R. appeared very scared, she was crying profusely and shaking so badly she could barely stand. Kessler took J.R. back to the office. Kessler called 911 again.

{¶ 11} McDaniel arrived at the gas station after about an hour. McDaniel told Kessler's co-worker that if Kessler did not bring J.R. out, he was pressing charges; Kessler refused. Police appeared about five minutes later. Kessler described that McDaniel "acted like he really didn't give two craps about anything[,] and he wanted things to go his way."

**Uncle**

{¶ 12} Uncle testified that he was in a relationship with aunt and first met J.R. when she was about five years old. He recalled McDaniel's family moved about eight times since uncle knew them, and he observed that J.R. was always punished for little stuff like she talked too loudly or dropped a bottle, and she was the only one punished. McDaniel had J.R. stand in the corner or not allow her to go anywhere when other family members did. Uncle described J.R. as a very good girl and smart; he did not know her to have friends.

4.

{¶ 13} Uncle received a call from aunt on November 23, 2021, that J.R. had left the house and everyone was looking for J.R. He went to a gas station and saw J.R. walking and shivering cold. He called out to her, she came over and said she did not want to go home, she wanted him to call the police. Uncle and J.R. went into the gas station and the clerk called the police. Uncle called aunt to let her know he found J.R.

{¶ 14} While waiting for the police, J.R. went to the back of the gas station. Police and McDaniel[1] arrived at the gas station; McDaniel wanted to take J.R. McDaniel was acting very nervous and was persistent to get J.R. out of there. McDaniel got angry when the police would not allow him to take J.R. Uncle talked with police and told them that J.R. never brought to his attention what was going on, but he felt something was wrong.

{¶ 15} McDaniel eventually left the gas station, but uncle stayed until J.R. left with the police.

**Detective Noah Bauer**

{¶ 16} Det. Bauer testified he worked for TPD as a patrolman in 2021 and on November 23, 2021, Bauer and his partner were dispatched to the Circle K for a juvenile call. Bauer was wearing a body camera, which was recording. He spoke with a clerk, then went to the back of the gas station to meet J.R., who was noticeably upset, crying, sometimes hysterical and her voice was shaking. Bauer and his partner discussed that

---

[1] Uncle's son was with McDaniel at the gas station, but this appeal does not involve the son, so he will not be mentioned hereafter.

5.

something was not right. After speaking with detectives, it was decided that J.R. would go to the police station and not with McDaniel, as it was not in J.R.'s best interest to go home.

{¶ 17} Bauer told McDaniel that J.R. was not going home; McDaniel got very defensive and antsy. Bauer never gave any indication to McDaniel regarding what J.R. said to the police, nor did Bauer say it had anything to do with McDaniel or accuse McDaniel of anything. McDaniel mentioned a Chromebook and said that was probably why J.R. ran away. McDaniel's demeanor was inconsistent with other runaway cases Bauer handled as parents were usually worried and grateful to have a child back, but McDaniel was never like that. Ultimately, Bauer and his partner took J.R. to the police station.

**Officer Matthew Harger**

{¶ 18} Officer Harger testified he worked for TPD, and on November 23, 2021, he and his partner, Bauer, were working the midnight shift when they were called to the Circle K for a juvenile needing assistance. Harger was wearing a body camera which was actively recording. While Bauer went to talk with J.R., Harger stood by in the front of the gas station; Harger had no clue of the nature of what they were dealing with. Harger spoke briefly with McDaniel and uncle. McDaniel identified himself as J.R.'s father and wanted to take J.R. home. McDaniel said he was on J.R.'s Snapchat on the Chromebook and found inappropriate sex stuff, and he should have waited until J.R. got

6.

home to say something to her about it. McDaniel also said he was going to tell the school.

**LCCS Worker**

{¶ 19} Nicole Dembski testified she was a sexual abuse caseworker in November 2021, and first met J.R. on the morning of November 23, 2021, at the agency, where J.R. was brought by Detective Nathaniel Morrison from the police station. The next morning, Dembski conducted a forensic interview with J.R., which was recorded. Generally, in an interview, a child tells his or her story and leading questions are not asked. After a child makes a disclosure, there is an automatic referral to Dr. Schlievert. J.R. was very detailed in what she disclosed and remained consistent when revisited later in the interview. After the interview, Dembski went with J.R. to see Dr. Schlievert.

{¶ 20} J.R.'s forensic interview was played for the jury.

**Dr. Randall Schlievert**

{¶ 21} Dr. Schlievert testified he is a pediatrician with specialized training in child abuse and neglect. He met with J.R. on November 24, 2021, and J.R.'s history was taken by a female social worker while he was in the room typing, observing and thinking of other questions that needed to be asked. He discussed the history given by J.R. including the kind of sex acts McDaniel had her do and some things that McDaniel said to her which included trying to intimidate her not to tell. The doctor also described J.R.'s demeanor as depressed looking and downtrodden. He conducted a physical examination of J.R. and found no injury, which was not unusual in sexual abuse cases. The doctor

7.

conveyed that a majority of children, teenagers and adults have normal exams, especially if there was no physical injury during the abuse or the abuse occurred days before.

{¶ 22} Dr. Schlievert said "I make diagnoses - not always, sometimes I can't make one[.]" His diagnosis of J.R. was that she was likely sexually abused, "based on her statements and behavior and exam," as "the only reasonable explanation for her behavior is her statement on her exam." The doctor was asked, "So you're relying upon the veracity of what she's telling you in order to reach the conclusions which you are formulating and to your report?" He answered,

> I would disagree. I'm not - I am not here to determine who tells the truth. As a doctor, our patients come to us, they tell us what is wrong, we treat them. I don't - someone comes to me and says my child says ADHD and here's what I say. I don't say you're lying to me, I base it on what I'm hearing. Does it match my training and experience? Does it make sense in the whole evaluation? And it did make sense. Why she ran away made sense. Why she didn't tell others at school, if that didn't happen, or her friends, because she got beat for telling her step mom and her dad psychologically - from her report, psychologically bribed her not to tell.
>
> She reported things very unique to her history being checked to make sure she was ready. So, again, it's not for me to evaluate whether that's the truth, I leave that to others in this room, including a jury, but based on what I heard, I saw nothing that didn't give me pause to say that what she was telling me was not from her personal experience, and I have to take that at face value. I'm not there to decide if she's telling the truth.

{¶ 23} The doctor testified that he "saw no other medical reason or psychologicals and/or behaviors, and that in that intervening two years, nothing has been presented . . . to doubt that opinion [that J.R. was likely sexually abused] as the only reasonable conclusion."

8.

**J.R.**

{¶ 24} J.R. testified that she lived with her mother until she was five years old, then her mother lost custody due to drugs and going to jail, so J.R. went to live with McDaniel. Most of the time that she lived with him, he weighed 300 or 400 pounds and was a Lyft or Uber or Door Dash driver. The stepmother did not work.

{¶ 25} J.R. testified about the numerous houses where the family lived, the six or seven schools she attended, and what occurred with McDaniel at the houses. She first lived on Emery Street with McDaniel and family, then they moved to Geneva Avenue when J.R. was in the first grade; the dining room was her bedroom. In the garage of the house, McDaniel tried to teach J.R. "how to do a BJ basically." Afterward, J.R. told her stepmother, who was on the front porch, and the stepmother "was shocked at first and she -- and then she heard [J.R.] yell and she went to [McDaniel] and confronted him about it." McDaniel called J.R. a liar and slapped her. J.R. described the inside of the garage and the car McDaniel had at the time. She said it also happened in McDaniel's bedroom. J.R. said it happened over 10 times on Geneva, and those times ended because her "jaw was hurting and we had to stop. We had to stop multiple times because [her] jaw was hurting. It was taking too much time." J.R. recalled that in the living room, McDaniel introduced her to inappropriate videos which he had on his laptop.

{¶ 26} The family moved to Maumee Avenue when J.R. was about 10 years old and in the fourth grade. She said sexual activity, "BJs and everything," with McDaniel occurred in his bedroom when the stepmother was out, and her brothers were upstairs. It

9.

happened 30, 40 times because "we barely lived there."  McDaniel's "one phrase he would usually say . . . [was] you make me feel young."

{¶ 27} When J.R. was almost 11 years old, halfway through fourth grade, the family moved to Oregon, Ohio.  Her stepmother had a seizure and stroke.  McDaniel did "more than just BJs and everything" with his private part and hand, which happened in J.R.'s bedroom and the garage.  He ejaculated for the first time and "checked" J.R. with his hand to see if she was ready ("upper front body part to see if I was hard, and my lower front private part to see if I was wet.").

{¶ 28} In the garage was a van; McDaniel usually took the back seat out of the van then J.R. "was laying down and he tries to put it in me but I was moving too much because I was in pain."  One time, J.R.'s brother, B., walked into the garage while J.R.'s pants were pulled down; B. looked confused and shocked.  McDaniel, who had been behind J.R., went in front of her to cover her up.  Afterward, J.R. told B., B. confronted McDaniel and they had an argument outside.  Since the family lived in Oregon for about three and a half years, J.R. said it happened a lot with McDaniel at this house.

{¶ 29} Next, the family moved to Craigwood Road when J.R. was 14 years old; she attended less than half of eighth grade while living there.  McDaniel did "[e]verything we talked about for the past years" to J.R. in her bedroom or his bedroom.  McDaniel put his private part in J.R.'s mouth and put his private part in her bottom.  One afternoon, the stepmother opened the closed door to her and McDaniel's bedroom and walked in; J.R. was there and McDaniel said he was doing pretzel yoga.  The stepmother

10.

looked shocked and disgusted. J.R. believed this was the last sexual contact McDaniel had with her.

{¶ 30} There was a camera pointed at J.R.'s bedroom door because she was not allowed to go downstairs at night, she could only go to the bathroom. J.R. was underweight and when she was younger, since she loved food and got into trouble, McDaniel took some food away from her. When J.R. was older, McDaniel accused her of eating too much and restricted food. He also monitored her, with the camera, so she could not eat at night.

{¶ 31} McDaniel did not let J.R. have friends who were boys and would not let her date until she was 16 years old. The only time J.R. had a close friend was when she lived on Craigwood, and she invited her friend over to the house multiple times. After being friends for three or four months, J.R. started to date her friend ("girlfriend"). The stepmother saw J.R.'s girlfriend go to kiss J.R. on the cheek on the front lawn and told McDaniel. J.R. thought McDaniel did not approve of the relationship because she was too young. She said he knew that she was likely bisexual because of how she dressed. McDaniel bought baggie clothes for J.R., not tight clothes.

{¶ 32} J.R. had Snapchat on a Chromebook but would uninstall it because she was afraid of her stepmother. J.R. spoke to her girlfriend on Snapchat, and on November 10, 2021, the girlfriend wrote "[c]an't even talk. You be talking at my breasts. Don't think I don't see you glancing." The girlfriend also wrote about some abuse that her real dad did to her (when she was a baby) and her mother. McDaniel saw the conversations and J.R.

11.

thought he had talked to her about them, it could have been the next day. He told her he contacted the school but no one at school spoke to J.R. about it.

{¶ 33} J.R. said that according to McDaniel, she was in trouble a lot and punishments included standing in the corner, getting her hand slapped, getting a whooping and going to her room where "there was nothing -- he had me stare at a wall or something." If J.R. lied, McDaniel would slap her, spank her or wash her mouth out with soap.

{¶ 34} McDaniel told J.R. he would get her pregnant when she was 17 years old; "[t]here was a contract. He made a contract[,] and I didn't sign it myself. He wrote it . . . basically in my handwriting." The contract said "I allow him to get me pregnant when I'm 17 and have the baby. . . And let him keep . . . the baby." She did not want a baby but did not want to say no because he would get mad, and she did not want to say yes.

{¶ 35} At doctor appointments, J.R. was never asked about sexual abuse and she never reported any physical injury because McDaniel was always in the room with her and the doctor. At school, J.R. was too afraid to talk to counselors about the abuse.

{¶ 36} On November 22, 2021, J.R. was at aunt's house with aunt, stepmother, step grandmother and aunt's daughter, A., who was six months younger than J.R. McDaniel called J.R. on A.'s cellphone and said he would tell the school about J.R. and her girlfriend. He said he had gone through the Chromebook. He tried to threaten J.R. by saying he would do the same thing to J.R.'s girlfriend that he did to J.R. and it would get worse. McDaniel also told J.R. she will never go back to aunt's house again.

12.

**{¶ 37}** J.R. waited for everyone to go to sleep, then snuck out of the house. She knew she had to get away because she did not want to live another three or four years of what she lived through. She walked around for two or three hours and was scared; uncle then noticed her and asked her why she was not at home and where her dad was. J.R. was crying; uncle grabbed her arm and tried to calm her down. She was really cold, so they went into the gas station and uncle said he would call McDaniel; J.R. told him not to call. The gas station worker called police and took J.R. to an office. J.R. was shaking and crying and about to pass out because she was very tired. J.R. stayed in the office and spoke with police. She did not know McDaniel was at the gas station. She went with the police to five or six different places, including LCCS, a foster home and to see a doctor and his assistant where she had a physical exam and gave a history of what had been happening to her.

**{¶ 38}** LCCS has permanent custody of J.R. and she has lived in the same foster home. She attends high school, is in the band and has two jobs. She got in trouble at her foster home, her punishment was having her phone taken away and she learned her lesson. She has never run away from her foster home. She said she misses her three brothers.

**S., Stepmother**

**{¶ 39}** S. testified that she was divorced from McDaniel, but they lived together. Their sons were 21, 26 and 27 years old and have always lived with her. J.R. was almost eight years old when she came to live with the family. S. denied that J.R. said that

13.

McDaniel put his penis in J.R.'s mouth and S. denied asking or confronting McDaniel about it. S. never asked McDaniel about sexual abuse, and she never saw McDaniel hit or slap J.R.

{¶ 40} In November 2021, S. walked in on J.R. and McDaniel doing yoga, as J.R. "asked him to show her [J.R.] how to do it." S. saw two-person yoga, which J.R. called a pretzel pose. S. said the door was open and McDaniel and J.R. both had clothes on. McDaniel did not say anything. S. left the room right away. S. said J.R. came out of the room and "said she learned that she wasn't flexible and she was laughing about it."

{¶ 41} During the girls' night, McDaniel called A. and he had a conversation with J.R. about the Chromebook. S. realized J.R. was gone around 3:00 and called McDaniel and he went to the gas station. After he left the gas station, McDaniel went to aunt's house early in the morning, when it was light; S. was there. McDaniel did not have J.R. with him and he said J.R. accused him of rape. S. did not think that was true, but she was not surprised. S. went to the police station with McDaniel and their son, S., that morning; McDaniel brought the Chromebook.

**B., Brother**

{¶ 42} B. testified he was 26 years old and lived with his mother and two brothers on Craigwood. B. always lived with his mother. He worked at Dollar General for two years; he did not have a job before that. When the family lived in Oregon, B. walked into the garage to tell McDaniel and J.R. that dinner was ready and saw "they were cutting up boxes. We had a lot of boxes. . . [J.R.] was laying on her stomach cutting up boxes and

14.

[McDaniel] was sitting next to her cutting up the boxes." After B. said dinner was ready, "[McDaniel] was still cutting up the boxes. [J.R.] got up and went around the tool area." B. left and a minute or so later McDaniel and [J.R.] came out of the garage. About an hour later, B. said he confronted McDaniel because "[J.R.] is always in her room. She gets in trouble a lot, so they punish her by putting her in her room and putting her in the corner, you know, the normal stuff, and a little bit too much, so I talked to him about it, and then we got in an argument." McDaniel said he was going to kick B. out of the house, but that did not happen.

{¶ 43} There was a camera facing J.R.'s door "well, it was pointing toward both doors [his parents' bedroom] . . . We put them up because she likes to come out of her room and get into the food in the middle of the night and just eat a lot of stuff."

{¶ 44} The night before J.R. ran away, B. was upstairs at home when McDaniel called him downstairs. McDaniel was very upset and "was in the Chromebook and found some Snapchat -- reading the Snapchat stuff." B. glanced at the Snapchat and thought J.R. was talking to a boy or girl; the rule was they were not allowed to date until they were 16 or 18 years old. McDaniel made a phone call and "started yelling at [J.R.] saying you don't need to be doing that type of stuff . . . and that he was going to school with the tablet tomorrow." B. said the conversation lasted a good 15-20 minutes. B. said his brother, Se., read the Snapchat message later. At that time, McDaniel weighed 350-400 pounds and wore a shift that was a size 6X.

15.

{¶ 45} B. heard that J.R. ran away around 2:00 from McDaniel, and they all got in the car to look for her. B. and his brothers were dropped off at aunt's house and went looking for J.R. while McDaniel drove around. B. heard from his cousin that J.R. was found, and they all walked back to aunt's house. McDaniel then drove to aunt's house and picked up B., his younger brother and a cousin and they went to the gas station. B. stayed in the car while McDaniel went into the gas station. When McDaniel returned to the car without J.R., McDaniel said he was "getting accused of stuff… [o]f being a child molester."

**Detective Nathaniel Morrison**

{¶ 46} Det. Morrison testified he worked for TPD, and on November 23, 2021, he was on the special victims unit, when he was called in to work at 4:00 a.m. He spoke briefly with Officers Harger and Bauer, then talked with J.R. Thereafter, Morrison met with and interviewed McDaniel, which was recorded. Morrison "was told that everything was on the Chromebook. The Snapchat would be there . . . but unfortunately that's not the case[.]" The "Chromebook was a very big deal for [McDaniel]." Morrison saw a picture taken from McDaniel's phone of the Snapchat conversation between J.R. and her girlfriend, which was "the only context of this Snapchat conversation that I have as an investigator . . . to go off of as far as what [McDaniel's] alleging he saw. What is alleged that he saw does not fit in any sort of parameters to the photograph of the conversation he took." Morrison did not find anything significant to the investigation in all of the digital media. He was only able to locate "the photograph taken of a computer screen with the

16.

cellphone that did have the same context or anything near the same context of what was being given and is the reason for alarm of the Snapchat usage."

{¶ 47} Morrison said "[t]he gravity of [J.R.'s] claims to me -- in my experience in my time in the special victims unit investigating crimes of sexual assault, the gravity of her claims didn't fit what the reasoning given as if it was a false claim. There was a lot of things that when I talked to [J.R.] that stood out with me and validated her statements to me as an investigator of clues that I look for, not just in verbiage, but how things are delivered; body language, eye contact."

{¶ 48} Morrison testified that "[t]he first time that [McDaniel] was advised that he was being charged with rape or advised of the allegation at all were during my interview after the time of 11:00 in the morning. And we've heard that there's been other people that have said that immediately after [McDaniel] returned from the gas station, he advised multiple people that he was alleged with sexual abuse at that point."

{¶ 49} Morrison asks any suspect of sexual abuse about the relationship with the victim. Morrison asked McDaniel about his relationship with J.R. and McDaniel's "was the first response that ever went immediately to a physical explanation of a relationship[.] . . . kissing, hugging, tablets, video games. There was no emotional connection that he described, there was just physical connection. . . . That was the first time I've ever had that response. That was very odd to me."

{¶ 50} Morrison also raised questions in interviews about a rape kit and DNA to gauge the response. He raised the possibility of DNA being present with J.R., in

17.

McDaniel's interview, and McDaniel "went on a defensive explanation of that he just wears condoms, but he only has sex with his wife."

{¶ 51} Morrison said that he executed a search warrant of McDaniel's home and spoke with B. on the front porch. B. "was very nervous and scared to talk[.] . . . He limited his eye contact. He would cover his mouth or his face while he was talking . . . and was very cautious and took a lot of pause with how he would provide his statement[.]"

{¶ 52} Morrison observed that "the way [J.R.] described her assaults to me as an investigator were alarming. The . . . agreement if she followed when she 17 was very alarming, and some of the statements that she made were just statements that are not commonly heard in my experience or nearly ever from a child victim as they're retelling their story of the abuse." He found J.R. "was very detailed . . . about specific places, occurrences, and small details in those occurrences. And when Nicole Dembski also conducted her forensic interview . . . with [J.R.] the following day, those same details . . . were present[.] . . . The fact that [the details] were there the following day in a different setting, different interviewer, had a lot of gravity for me in my investigation."

**Se., Brother**

{¶ 53} Se. was called by the defense and testified that he was 20 years old, graduated from high school and worked at Dollar Tree for almost a year. He lived at five different houses with his family. At the Emery house, J.R. came to live with the family and "[w]e were just poor so we didn't have that much food." Food was an issue when the

18.

family lived on Geneva and Maumee, but not when they lived in Oregon and on Craigwood.

{¶ 54} Growing up, Se.'s brother, N., and J.R. would get punished by being grounded from electronics. J.R. was grounded a lot for electronic media violations and lying.

{¶ 55} On November 22, 2021, Se. was home when he heard McDaniel yelling through the phone at J.R. McDaniel pointed out a Snapchat message on the Chromebook and Se. read the message that J.R. and her girlfriend "were fingering each other behind the bleachers" ("bleachers Snapchat message"), but could not remember who sent that message, J.R. or her girlfriend. McDaniel "was mad about it because she was under[]age for that." McDaniel had rules about social media which were they "weren't allowed to talk to anyone because, you know, there's strangers online[,]" but they could play games.

{¶ 56} After J.R. ran away, Se. went to look for J.R. and then went with McDaniel to the gas station but Se. waited in the car. When McDaniel came out of the gas station, he did not say anything as "[t]he detective didn't say anything about it." Another time in his testimony, Se. said "we just talked about how we were just confused on why she ran away because we didn't know why she ran away." Se. said they drove to Craigwood, got the Chromebook and took it to the aunt's house so A. could save the Snapchat messages.

{¶ 57} At another point in his testimony, Se. said after J.R. ran away he was at aunt's house and looked at the Chromebook and saw the bleachers Snapchat message from J.R. to her girlfriend. No one took a screenshot of this message.

19.

**{¶ 58}** Se. said he and his brothers lived with McDaniel their entire lives and none of the brothers was ever in a relationship. Se. thought neighbors came into their home, but he did not know any of the neighbors' names. Se. never had a friend over at the house and J.R.'s girlfriend was never in the house. McDaniel decided what the family ate for dinner, he would buy the snacks, and he would buy the clothes. Se. never went into J.R.'s room because "[it]'s her own room. It's her privacy."

**{¶ 59}** Se. was shown a screenshot that McDaniel took on November 23, 2021, at 5:04 a.m. of a Snapchat conversation between J.R. and her girlfriend about looking at breasts; Se. had never seen that message before.

**{¶ 60}** Se. testified a camera was pointed at J.R.'s room as "[s]he was crawling out of her bedroom and eating the food and stuff, and after a certain time the kitchen is closed[.]"

**McDaniel**

**{¶ 61}** McDaniel testified he weighed 177 pounds, but he weighed 450 to 500 pounds when he lived on Geneva and Maumee and was 350 pounds when he was arrested in November 2021. He received legal custody of J.R. when she was five years old, and they lived on Emery. They moved to Geneva and McDaniel started working with Lyft and Uber, he worked 12 to 16 hours a day, every day, and made $400 to $500 almost daily. McDaniel said "[w]e struggled with food . . . but we always made sure they ate. But house and clothes-wise everything was perfect." While living at Geneva, B.

20.

confronted McDaniel for touching J.R. which McDaniel said was because he "busted her -- her bottom too hard when I gave her a whooping, that all that was."

{¶ 62} The family moved to Maumee and McDaniel started working for Door Dash. Then, the family moved to an Oregon house owned by McDaniel's brother. After five years, at the end of the summer of 2021, the family moved to Craigwood because McDaniel's brother decided to sell the Oregon house.

{¶ 63} McDaniel provided the necessities for his four children, and they always had sufficient food, clothing and shelter. McDaniel married S. in 1996, they subsequently divorced, lived a part for one year, then lived together again. He described his overall relationship with S. as "we were perfect. I mean, nothing was wrong. We was good together. . . Prior -- I mean, after we divorced, we started getting along way better [sic]."

{¶ 64} The rules of the house are that "they ain't allowed to date until they were 16. . . no lying, . . . social media is out because I've been watching stuff on TV that I didn't like, like kids getting tooken because of social media, and the way they talk on there [sic]." If the rules were broken, there would be specific punishment. McDaniel said only J.R. violated the rules, and he would usually take away her electronic devices and "[w]hen I get really mad, she have to sit in her bedroom until I calm down, at least then, that way nothing goes further than that [sic]." He would also have J.R. sit in a corner for 15 minutes and after that he asked her "can you explain why to me you got in trouble, that's it. You have to give a definition before they can be released -- I mean, off

21.

punishment [sic]." McDaniel punished B. when "we got in a fight, me and him, because he wanted to quit school at 18. The punishment is because he actually hit me and I went off on him. I didn't hit him. Anyways, I actually made him -- took his computer away." When Se. was younger, he was mouthy, so he had to sit in the corner.

{¶ 65} McDaniel said there was never anything inappropriate with J.R. He did yoga with her "which basically consists of stretching. That's all it was. She wanted to learn something called pretzel. I didn't know how to do it, the pretzel part. Basically, what I seen, you have to fold your body all the way up. It's kind of, no. When I was a kid, I took martial arts, and part of martial arts, it's part of Yoga, and so we was doing stretching [sic]." He did yoga with J.R. in his room, twice a week and he was "about 375 I think I was, maybe 370, 400 [pounds]." He said S. walked in all of the time because the door was open. He and J.R. did yoga on the floor, but he said "[t]here's no way I could do the pretzel. I told her it's not possible." Also, he "never said [that when J.R. turned 17 he wanted to have a baby with her]. I can't have kids. . . I've been -- I call it fixed. After she was born, I didn't want no more kids [sic]." He said there was no truth to J.R.'s testimony that he would see if she was ready, and he would check her private parts.

{¶ 66} McDaniel said he and J.R. cut up a big cardboard box in the garage in Oregon and both were fully clothed; J.R. was lying on her stomach.

{¶ 67} McDaniel testified "the camera got put up in the Craigwood residence because when I was -- I had a second COVID shot. I got sick. I was sick for like three months. Anyways, what happened is I put the camera in there because I noticed cough

22.

medicine coming up missing out of my bedroom. Then I turned around -- I have a dagger. . . there's a dagger on my desk that -- it was in her room, in her closet, so I have to monitor -- she was sneaking into my bedroom and taking stuff out of there."

{¶ 68} Regarding the Chromebook, McDaniel said anyone could use it, the "only condition is there's social media to be monitored, and turn around, anything have to be watched, anything set." He had access to view what others saw on the Chromebook, and McDaniel checked J.R.'s usage occasionally. He told her no Snapchat or Instagram. J.R. talked to her girlfriend, a kid named Sean and another person. Prior to November 22, 2021, McDaniel saw nothing concerning on the Chromebook.

{¶ 69} On November 22, 2021, at about 8:00 p.m., McDaniel was upstairs in his bedroom, got on the Chromebook, Snapchat popped up, he read the messages, and the second one was the bleachers Snapchat message. He said the girlfriend wrote that message. He took a picture of one of the messages, dated November 10, 2021, but did not take a picture of the bleachers Snapchat message because "I just -- I snapped. I just got mad." He called A.'s phone to talk or Facetime with J.R. and he "confronted [J.R.] and asked her how she got the Chromebook because it was in my bedroom. She told me that she crawled in there and got it out. Well, I did yell at her and I did tell her when she got home, I'm busting her behind, I'm going to give her a butt whooping, and she's going in the corner. . . Now I got to go to the school and report it [sic]." After 15 to 20 minutes, he said he would deal with it tomorrow and hung up on her.

23.

{¶ 70} The next morning, McDaniel was out looking for J.R. with one of his kids and was two minutes from the gas station when he heard she was there. He went to the gas station around 3:30, where he learned about J.R.'s allegations about sexual improprieties because A. called him and told him, and she found out from uncle. McDaniel thinks J.R. was so worried about being in trouble that she ran away and made up a story of rape.

### Assignment of Error

{¶ 71} McDaniel argues his counsel was ineffective for failing to object to the improper opinion testimony by Dr. Schlievert that J.R. was "likely sexually abused." McDaniel contends this failure to object violated his right of confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

{¶ 72} McDaniel relies on, inter alia, *State v. Boston*, 46 Ohio St.3d 108, 128 (1989), where the Supreme Court of Ohio held that an "expert's opinion testimony on whether there was sexual abuse . . . is . . . admissible[,] . . . [but] an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." The court found the expert "was also allowed to express her opinion that [the child] had not fantasized her abuse and that [the child] had not been programmed to make accusations against her father. With this testimony, [the expert], in effect, declared that [the child] was truthful in her statements." *Id.* The court set forth "[w]e have little difficulty in finding that the admission of this testimony was not only improper-it was egregious,

24.

prejudicial and constitutes reversible error." *Id.* The court, quoting *State v. Eastham*, 29 Ohio St.3d 307, 312 (1988), further set forth "that such an opinion '* * * acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'" *Id.* at 128-129.

{¶ 73} McDaniel notes that Dr. Schlievert's opinion that J.R. was "likely sexually abused" was based on J.R.'s statements, behavior and medical examination, but submits that no medical evidence existed that J.R. had been sexually abused, as the medical exam and laboratory results were unremarkable. McDaniel asserts the doctor's opinion was based solely on statements from J.R., which constitutes an opinion as to J.R.'s veracity and is impermissible.

{¶ 74} McDaniel further argues counsel should have been aware that no medical or physical evidence existed to corroborate the allegations against him at trial, effectively making the State's case a "credibility contest." McDaniel contends since he did not testify in his own defense, it was entirely unreasonable for counsel to allow the doctor's testimony establishing J.R.'s credibility.[2]

{¶ 75} McDaniel also observes that since counsel did object to Det. Bauer's testimony that the detective found J.R. credible, it was unreasonable for counsel not to

_____

[2] As set forth above, McDaniel did testify at trial.

object to the same type of testimony elicited from an expert witness. McDaniel claims counsel's failure to object to Dr. Schlievert's improper opinion testimony prejudiced McDaniel and violated his right to due process.

{¶ 76} McDaniel requests that his convictions be vacated or, alternatively, that his convictions be reversed and the matter remanded to the trial court for a new trial.

### Standard - Assistance of Counsel

{¶ 77} The standard of review for ineffective assistance of counsel was stated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, an appellant must satisfy a two-prong test. First, appellant must show that counsel's performance was deficient such that counsel made errors so serious that counsel was not functioning effectively, as guaranteed by the Sixth Amendment. *Id.* at 687. Second, appellant must show the deficient performance prejudiced the defense, and deprived appellant of a fair trial. *Id. See also State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Stricklan*d at 697.

### Law - Experts - Vouching

{¶ 78} In addition to the *Boston* case, the Supreme Court of Ohio addressed the issue of an expert's testimony regarding a child who alleged sexual abuse in *State v. Stowers*, 81 Ohio St.3d 260, 261 (1998), and held that "[a]n expert witness's testimony

26.

that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence." The *Stowers* court ruled that "*Boston's* syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (e.g., the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person). It does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." *Id.* at 262-263. The *Stowers* court explained the distinction "between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." *Id.* at 262.

{¶ 79} Moreover, in *State v. Coleman*, 2016-Ohio-7335, ¶ 29 (6th Dist.), this court explained that "an expert in child sexual abuse can testify as to his or her opinion on whether the child was abused, but the expert may not testify as to the veracity of the child's statements." If an expert bases his or her opinion that a child was sexually abused solely on the child's statements, this is nothing more than an opinion on the child's veracity. *Id.* Therefore, there must be something other than just the child's allegations which aided the expert in arriving at his or her opinion, like physical evidence or the expert's observations of the demeanor of the child or other indicators that show the child was sexually abused. *Id.*

27.

**Analysis**

{¶ 80} Upon review, Dr. Schlievert's diagnosis and opinion that J.R. was likely sexually abused were based on J.R.'s statements, behavior and medical examination. The doctor did not provide an opinion about J.R.'s propensity for truthfulness or whether J.R. had, in fact, been truthful. Rather, the doctor articulated that he looked for "idiosyncratic details, things unique to a situation. . . and the way a child describes it." Dr. Schlievert described J.R.'s demeanor, he observed that she reported things very unique to her history and he utilized his training and experience to determine that what J.R. said made sense based on the whole evaluation.

{¶ 81} We find that Dr. Schlievert's opinion, that J.R. was likely sexually abused, was not based solely on statements from J.R. We further find that the doctor did not opine as to J.R.'s veracity and therefore, his opinion was permissible. As such, we find no error occurred, and since there was no error, McDaniel's counsel was not ineffective or deficient for failing to object to Dr. Schlievert's opinion testimony.

{¶ 82} Even assuming Dr. Schlievert's opinion testimony was objectionable, McDaniel has not shown that his counsel's failure to object affected the outcome of the trial, as the record contains other evidence from which the jury could determine that McDaniel repeatedly raped J.R. Some of the other evidence presented by witness testimony and exhibits offered at trial includes: the testimony of S. and B. that McDaniel told them J.R. was accusing him of rape and being a child molester before the police told McDaniel what J.R. had disclosed; McDaniel's testimony that A. told him that J.R. was

28.

accusing him of sexual improprieties, which A. learned from uncle, but uncle did not testify that J.R. told him why she ran away or was upset; Ltn. Cook's testimony about a 911 incident report which indicated J.R.'s step-grandmother had information about McDaniel inappropriately touching J.R.; the inconsistencies within Se.'s testimony that he was home on November 22, 2021, heard McDaniel yell at J.R. on the phone, McDaniel pointed out the bleachers Snapchat message on the Chromebook and Se. read it and could not remember who sent the message, but later Se.. testified that after J.R. ran away and while he was at aunt's house he looked at the Chromebook and saw the bleachers Snapchat message from J.R. to her girlfriend; the inconsistencies between the testimony of Se. and McDaniel as to who wrote the bleachers Snapchat message - Se. said he did not remember then said it was written by J.R. while McDaniel said the girlfriend wrote it; the incredible explanations by C. and McDaniel about J.R. lying on her stomach cutting up cardboard in the garage with McDaniel, and by S. and McDaniel about J.R. and McDaniel, at about 375 pounds, doing yoga in the bedroom; McDaniel's jail call where he said that he goes home if J.R. does not come to court.; and J.R.'s detailed, consistent testimony about the numerous times, places and manners in which McDaniel raped her over a period of years.

{¶ 83} Upon review of the record and the applicable law, we find McDaniel failed to satisfy both steps in *Strickland* and did not establish his trial counsel was ineffective.

{¶ 84} Accordingly, McDaniel's assignment of error is not well-taken.

29.

**{¶ 85}** We affirm the May 24, 2023 judgment of the Lucas County Court of Common Pleas. McDaniel is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Thomas J. Osowik, J. | _____ |
| | JUDGE |
| Myron C. Duhart, J. | |
| CONCUR. | |
| | _____ |
| Christine E. Mayle, J. | JUDGE |
| DISSENTS AND WRITES | |
| SEPARATELY. | |

**MAYLE, J., dissenting,**

**{¶ 86}** I respectfully dissent from the majority decision. I agree with McDaniel that trial counsel was ineffective in his handling of Dr. Schlievert's opinion testimony. In fact, trial counsel did not just fail to object to Dr. Schlievert's improper opinion testimony, he actually *elicited* the prejudicial testimony himself. I would find McDaniel's assignment of error well-taken.

## A. *Boston* and *Stowers*

{¶ 87} As recognized by the majority, the Ohio Supreme Court held in *Boston,* 46 Ohio St.3d 108, that the use of expert testimony in child abuse cases is proper, but "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Id.* at syllabus. Thereafter, in *Stowers,* 81 Ohio St.3d 260, the Court clarified that an expert witness may testify that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children.

{¶ 88} In *Boston,* defendant was charged with sexually abusing his two-and-a-half-year-old daughter. The child was not competent to testify at trial, and many of the child's accusations were introduced through her mother and two expert witnesses who testified and provided opinions. Much of the Court's decision was devoted to addressing the admissibility of the child's out-of-court statements and imploring the Rules Advisory Committee and the legislature to adopt rules and procedures for adjudicating child abuse cases. But more pertinent to the present case, the Court also addressed the admissibility of expert opinions in child abuse cases.

{¶ 89} Two doctors testified at trial. The first doctor, Dr. Asch, explained that she examined the child and observed whitish discharge and redness around the child's labia minora and a larger-than-normal hymeneal opening. The child pointed to her vagina and said that her father had "put a telephone in there and it hurt," and when the doctor attempted to examine the child's anus, the child told her "don't touch that." The doctor testified that based on her internal medical examination of the child, the child's

31.

statements, and the child's medical history, her opinion was that there had been probable vaginal penetration and possible rectal penetration. She also testified that the child had not fantasized the abuse and had not been programmed to make accusations against her father.

{¶ 90} The second doctor, Dr. Lord, testified that she observed the child's activity with sexually-anatomically-correct dolls and found that the child's manner of handling the dolls (inserting the male doll's penis in the female doll's vagina), was indicative of sexual abuse. She also testified that the child told her that her father "put something in [her] bucket" and she "didn't like it." Dr. Lord testified that "the child was not falsifying."

{¶ 91} The Ohio Supreme Court found that Dr. Asch and Dr. Lord's opinions that the child was sexually abused were properly admitted because the experts possessed specialized knowledge acquired by training and experience and rendered opinions based on facts and data perceived by them. It concluded, however, that it was reversible error to admit Dr. Asch's statements that the child had not fantasized the abuse and had not been programmed to make the accusations and Dr. Lord's statement that the child was not falsifying. It reasoned that the fact-finder—not an expert or lay witness—bears the burden of assessing the witnesses' credibility and veracity, and it was "not only improper," but rather "egregious" and "prejudicial" to allow those witnesses to pass on the victim's credibility. *Id.* at 128-129.

32.

{¶ 92} In *Stowers,* 81 Ohio St.3d 260, the defendant was accused of sexually abusing his four children. Three of the children changed their stories between the time of their initial interviews and trial. Two of them originally claimed that their father abused them, but testified at trial that he did not; one of the children denied at her initial questioning that her father abused her, but testified at trial that he did. A psychologist testified at trial and explained that behaviors like recantation of accusations and delayed disclosure are common in abuse victims. She opined that the behavior of the children in changing their stories was consistent with the behavior of other children who had been sexually abused, and their recantation did not change her assessment that the children had been abused.

{¶ 93} The Court held that an expert witness may testify that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children. *Id.* at 261. It reasoned that the psychologist's opinions were helpful to the jury because she had "specialized knowledge that the average person lacks about behavioral characteristics of child abuse victims." The defendant argued that the psychologist's opinions implied to the jury that she believed the children's testimony, impermissibly bolstering their credibility. But the Court clarified that the basis of the psychologist's testimony "was not her belief in the children's statement but rather conclusions drawn from her observations of the children's behavior." *Id.* at 263. It differentiated between an expert's opinion that a child is telling the truth and an opinion that merely bolsters the child's credibility because it supports the allegations.

33.

**{¶ 94}** In sum, *Stowers* permits an expert witness to testify that the behavior of an alleged child-victim of sexual abuse is consistent with the behavior of other child-victims of sexual abuse. This kind of opinion testimony can be important, especially in cases involving recantation, delayed disclosure, sexual grooming, or the absence of physical manifestations of sexual abuse—topics that may seem counterintuitive to an untrained lay juror. *Boston* prohibits an expert from vouching for a child-victim's credibility.

**{¶ 95}** But improper vouching may occur not only in cases where an expert testifies that he or she believes the child is telling the truth; it may also arise where the expert testifies that it is his or her opinion that the child was sexually abused and such opinion is based *only* on the child's statements. In those situations, an opinion that a child has been sexually abused is tantamount to an opinion that the child is telling the truth. *See, e.g., State v. Knight,* 2006-Ohio-6437, ¶ 32 (8th Dist.); *State v. Winterich,* 2008-Ohio-1813, ¶ 27 (8th Dist.) And in cases that require resolution of credibility contests, such an opinion may act "as a litmus test of the key issue in the case" and "infringe[] upon the role of the fact finder." *Boston* at 128-29, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, (1988). This is why Dr. Schlievert's opinions are problematic.

## B. Dr. Schlievert's Opinions

**{¶ 96}** The State's direct examination of Dr. Schlievert was short. It inquired about his education and training, experience, and methodology for conducting medical evaluations of suspected sexual abuse victims, and he provided the foundation for the admission of his evaluation. Dr. Schlievert repeated the history conveyed to him by J.R.,

34.

which he said is the most important part of his evaluation; described his physical examination, which was essentially unremarkable, and explained why a negative physical exam does not rule out sexual abuse; and described J.R.'s demeanor as "depressed looking" and "downtrodden," yet still exhibiting some positivity. Dr. Schlievert's report was admitted during his direct examination, and that report opined that J.R. had likely been sexually abused. But the State's examination stopped short of eliciting that opinion from Dr. Schlievert. Moreover, the State did not question Dr. Schlievert whether he believed the victim. Defense counsel did this.

{¶ 97} On cross-examination, defense counsel confirmed what he already knew—that J.R.'s physical examination revealed no abnormalities or physical injury. As I interpret the State's questioning and arguments in closing, this appears to have been the State's main objective in examining Dr. Schlievert—to educate the jury that sexual abuse can occur without causing objective, physical injury. The case law is clear that "[e]xpert testimony is permissible to explain why a normal physical exam is not inconsistent with a history of sexual abuse or what behaviors are consistent with such abuse." *State v. Mincey*, No. 2023-Ohio-472, ¶ 46 (1st Dist.). But unlike the State, defense counsel elicited Dr. Schlievert's opinion that J.R. was likely sexually abused. He also repeatedly sought Dr. Schlievert's concession that the sole basis for his opinion was that he believed J.R. was telling the truth.

{¶ 98} Dr. Schlievert denied that his diagnosis of sexual abuse was based solely on his belief that J.R. was being truthful. However, as the Seventh District explained in

*State v. Schewirey,* 2006-Ohio-7054, ¶ 50 (7th Dist.), "[a]n expert does not need to say, 'I believe the child was sexually abused,' in order to give an improper opinion on the child's veracity." Rather, "[w]hen an expert bases their diagnosis on nothing more than what the child tells them, then their 'diagnosis' is nothing more than an opinion on the child's veracity." *Id.* "To say otherwise would elevate form over substance." *Id.* Here, the normal physical exam does not mean that J.R. was not abused, but it also could not have formed the basis for Dr. Schlievert's opinions. The basis of Dr. Schlievert's opinions was J.R.'s statements.

{¶ 99} Dr. Schlievert claimed that he relied on J.R.'s behavior to support his opinions, and the State points this out repeatedly in its brief. But Dr. Schlievert never identified specific behaviors to support his diagnosis and neither did the State in its brief. *Compare State v. Kelly,* 93 Ohio App.3d 257, 266 (5th Dist. 1994) (four-year-old and six-year-old victims bed-wetting and masturbating); *Boston* (two-and-a-half year old victim manipulating dolls in such a way as to simulate intercourse). Dr. Schlievert testified only that J.T. was "depressed looking" and had told him that she left a sleepover at her aunt's house because she did not want to go home to her father the next day. In fact, on redirect examination, he testified that he didn't document "any unusual behaviors that made [him] feel that [J.R.] was not acting like a ['normal'] . . . 14-year-old." Nevertheless, Dr. Schlievert repeatedly denied that his opinions were based solely on what J.R. told him.

{¶ 100} That Dr. Schlievert never detailed anything other than J.R's statements as providing the basis for his diagnosis is apparent even from the majority's recitation of its

36.

reasons for finding Dr. Schlievert's testimony proper. As described by the majority, Dr. Schlievert formed his opinions based on "idiosyncratic details, things unique to a situation . . . and the way a child describes it" and based on his conclusion that what J.R. told him "made sense." This is all just another way of saying that Dr. Schlievert based his opinions on what J.R. told him because he believed that she was telling the truth. There is simply no other support for his opinions. Accordingly, despite his contention to the contrary, it is clear that Dr. Schlievert's opinions were, in fact, wholly based on his assessment of J.R.'s credibility. In concluding otherwise, the majority overlooks the substance of Dr. Schlievert's testimony.

{¶ 101} The State urges that it was trial strategy not to object to the harmful testimony. It explains that counsel may have made the tactical decision not to object to Dr. Schlievert's testimony in order to avoid highlighting negative testimony.

{¶ 102} It is true that "[d]ebatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995), citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). Also, generally speaking, "mistakes, errors of judgment or unsuccessful trial strategies are not sufficient to find ineffective assistance of counsel." *State v. Hummel,* 1981 WL 5875, *4 (6th Dist. Dec. 18, 1981). And sometimes it is better strategy for counsel to refrain from raising a legitimate objection so as not to draw attention to unfavorable testimony. *See State v. Strickland,* 2003-Ohio-491, ¶ 17 (6th Dist.).

37.

{¶ 103} But failure to object to improper testimony can constitute ineffective assistance of counsel. *See State v. Bruce*, 2023-Ohio-3298, ¶ 83 (3d Dist.), quoting *State v. Nichols*, 116 Ohio App.3d 759, 765 (10th Dist. 1996). ("'[W]here resolution of factual issues turns solely upon the credibility of witnesses, failure to object to hearsay testimony which bolsters the credibility of witnesses constitutes ineffective assistance of counsel.'"). And I would emphasize that this was not a mere failure to object to testimony. Counsel himself elicited Dr. Schlievert's problematic opinions. In trying to make the point that Dr. Schlievert's diagnosis was wholly based on J.R.'s statements, counsel drove home for the jury that Dr. Schlievert believed J.R. and "saw no other reason for the evaluation terms except the conclusion [he] reached."

## C. Misapplication of *Boston*

{¶ 104} The majority holds that "[e]ven assuming Dr. Schlievert's opinion testimony was objectionable, McDaniel has not shown that his counsel's failure to object affected the outcome of the trial, as the record contains other evidence from which the jury could determine that McDaniel repeatedly raped J.R." But most of the evidence pointed to by the majority concerns when and how McDaniel became aware that J.R. was accusing him or rape, whether J.R. ran away because McDaniel had been sexually abusing her or whether she did so because McDaniel had found troubling Snapchat messages between J.R. and her girlfriend for which she would be punished, and whether witnesses provided incredible explanations for strange conduct that they observed. None of this evidence transformed this case into something other than a credibility contest.

38.

**{¶ 105}** Moreover, the Ohio Supreme Court in *Boston* made clear that the improper admission of such evidence requires reversal because it is not just improper to allow an expert witness to pass on the victim's credibility—it is "egregious" and "prejudicial." *Boston,* 46 Ohio St.3d at 128-129. This is consistent with its acknowledgment that because of an expert witness's "educational background" and "apparent prestige," his or her testimony is likely to make an impression on a jury and to be accorded great weight. *State v. Holt,* 17 Ohio St.2d 81, 86, (1969). *See State v. Dale*, 1992 WL 164009, *4 (2d Dist. Jul. 14, 1992) (finding that trial counsel was ineffective and committed reversible error by failing to object to a physician's testimony that he found the child victim credible, reasoning that the State's case involved essentially uncorroborated allegations of sexual abuse that required the jury to determine who was telling the truth).

**{¶ 106}** Finally, the State argues that while "an expert witness who testifies that the victim is telling the truth commits error, . . . Ohio appellate courts have held that any such error is harmless when the victim testifies and is subject to cross-examination." The State is correct that many courts, including this court, have repeated this assertion. *See State v. Coleman,* 2016-Ohio-7335 (6th Dist.), quoting *State v. Hupp,* 2009-Ohio-1912, ¶ 20 (3d Dist.), quoting *State v. Thompson,* 2007-Ohio-5419, ¶ 50 (4th Dist.); *State v. Smith,* 2016-Ohio-3418, ¶ 45 (7th Dist.); *State v. Benjamin,* 2006-Ohio-5330, ¶ 19 (8th Dist.); *State v. Smith,* 2005-Ohio-63, ¶ 24 (12th Dist. ) (holding that *Boston* is inapplicable when the child victim testifies and is subject to cross-examination). But I

39.

question this proposition of law. Although the fact that a victim testifies allows the jury to independently assess his or her credibility, it does not open the door for expert witnesses to weigh in with their own credibility determinations. Characterizing this as harmless error if the victim testifies would have the effect of implicitly sanctioning this strategy by the State.

{¶ 107} Tracing the case law back, it appears that this faulty proposition originated in the Fifth District in 1998, four years after that court decided *Kelly*, 93 Ohio App.3d 257, 264 (5th Dist. 1994). In *Kelly,* after the children-victims testified, a social worker was permitted to testify that she performed an initial history for the purposes of diagnosis and treatment, and during the history, the children stated that their father had touched and hit them. Defendant argued that the children's statements constituted inadmissible hearsay.

{¶ 108} As I previously mentioned, *Boston* discussed at length the admissibility of the out-of-court statements of the child-victim, a toddler, who did not testify. The Court discussed in great detail both the rules of hearsay and potential confrontation clause implications. The Court ultimately held, pursuant to its inherent powers, that "an out-of-court statement of an allegedly abused child of tender years, including identification of a perpetrator, made to a qualified expert in child abuse, is admissible if the expert has independent evidence of physical or emotional abuse of the child, the child has no apparent motive for fabricating the statement and the child has been found unavailable after a good-faith effort to produce the child in court." *Boston* at 127.

40.

{¶ 109} *Kelly* examined the children's statements under the guidelines set forth in *Boston,* but it concluded that the concerns at issue in *Boston* were not present because the victims had testified and were subjected to cross-examination and confrontation. It did not say that *Boston*—as it applies to testimony about credibility or veracity—is inapplicable when the child victim testifies and is subject to cross-examination. Nevertheless, in 1998 in *State v. Schoenberger*, 1998 WL 515899 (5th Dist. Jan. 13, 1998), the court, citing *Kelly,* held that the trial court did not commit reversible error in allowing three social workers to testify as to the veracity and credibility of the victims' statements because *Boston* does not apply where the victim testifies. Thereafter, other courts began holding likewise and the proposition of law mushroomed from there. The State seeks to perpetuate this highly questionable proposition of law, and we must refrain from doing so.

### D. Conclusion

{¶ 110} In sum, I agree with McDaniel that trial counsel was ineffective in his handling of Dr. Schlievert's testimony. In reaching this conclusion, I do not mean to suggest that J.R. was not a credible witness or that she falsified allegations of sexual abuse. I mean simply to state that this case presented a credibility contest that the jury was capable of—and required to—resolve on its own without considering whether Dr. Schlievert believed J.R. was telling the truth. Because defense counsel not only failed to object to the admission of these highly prejudicial opinions, but actually elicited them

41.

himself on cross-examination, I would find that his performance fell below an objective standard of reasonable representation and prejudiced McDaniel.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

42.